Lauren Gelman, State Bar No. 228734
Jennifer Stisa Granick, State Bar No. 168423
Megan Adams, Certified Law Student
STANFORD LAW SCHOOL
CYBERLAW CLINIC
CENTER FOR INTERNET & SOCIETY
Crown Quadrangle
559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 724-3358
Facsimile: (650) 723-4426
E-mail: gelman@stanford.edu

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| KEVIN POULSEN, | Case No.: C 06-1743 SI |
| Plaintiff, | DECLARATION OF KEVIN POULSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| UNITED STATES CUSTOMS AND BORDER PROTECTION, | Hearing Date: May 19, 2006<br>Time:          9:00 a. m.<br>Courtroom:    10, 19th Floor |
| Defendant. | |

I, KEVIN POULSEN, declare:

1.  I am submitting this declaration in support of Plaintiff's Motion for Summary Judgment.  I make this declaration based on my own personal knowledge.

2.  My name is Kevin Poulsen and I reside in San Francisco, California.  I am a full-time journalist with Wired News, an online news magazine.  I primarily report on current technology issues, including computer security and electronic privacy.

//

3.   In the course of my reporting at Wired News, and at publications at which I've worked in the past, I've used the Freedom on Information Act to obtain documents from government agencies. I've found the FOIA is a valuable tool for reporting on federal government activities.

4.   On August 19, 2005, a story by the Associated Press reported that a virus had shut down a United States Customs and Border Protection ("CBP") computer system on August 18, 2005 for several hours.  A true and correct copy of the article is attached to this declaration as Exhibit A.  According to the story, the affected computer was a government database used to determine if international travelers were fit to "clear immigration," and its failure forced customs agents in airports around the country to resort to manual inspections. As a result, the article reports, thousands of international travelers were subjected to substantial delays. (Exhibit A.) The article cited official statements made by a Department of Homeland Security spokesman, a spokesman for CPB in southern Florida, and a customs spokesman in Los Angeles.  (Exhibit A.)

5.   On August 22, 2005, I wrote a letter to CBP requesting under the FOIA "any documents (including but not limited to electronic records) detailing, describing or concerning the August 18th, 2005 failure of a CBP computer system …" A true and correct copy of that letter is attached as Exhibit B.  In that letter, I also sought expedited processing of my request for records, noting that I am a person primarily engaged in disseminating information to the public and that there is an urgency to inform the public. I wrote in the letter that because the computer system "was reportedly responsible for security screening of international travelers entering the U.S.," and had apparently been compromised by a computer virus, its failure could "suggest strongly that a federal government computer system providing a vital security function was not adequately protected from outside attacks, and could be subject to continuing and serious compromises." It was and remains my belief that because the public has an "obvious and urgent interest" in the "safety of U.S. borders," there exists a true urgency to inform the public of the details of the reported failure.

6.   I did not receive any response from CBP on my expedited processing request before the expiration of ten calendar days as required by the FOIA's expedited processing provision.

DECLARATION OF KEVIN POULSEN IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. C-06-1743 SI

7.    CBP contacted me on September 23, 2005, when I received a phone call from Erlinda Byrd. Ms Byrd identified herself as a CBP employee within the Office of Public Affairs, and said that my request had been received, but that the official or officials processing it would prefer that I voluntarily withdraw the request. Ms Byrd said those officials did not want to go to the trouble of conducting a records search that, in their view, would produce no information that they would be inclined to release, except for information that had already been released to the public and reported in the news. I respectfully declined her request.  Ms Byrd did not in any way indicate that her telephone call was intended as a denial of my request, therefore I expected that an official answer would be forthcoming.

8.    On December 9, 2005, I telephoned the office of the FOIA/Privacy Act officer for CBP in Washington DC in an effort to ascertain the status of my request.  The office informed me that my request had been forwarded to CBP's Office of Information and Technology ("OIT"), and gave me a telephone number to call at that office.  I then called the OIT and spoke with Diane Hundertmark, who identified herself as the CBP official in charge of FOIA requests within the OIT.  She told me that she had no record of my request. Ms. Hundertmark said that the OIT processed very few FOIA requests, and that she would have a record of any request directed to that office.

9.    In a letter I sent on December 9, 2005, I notified the CPB's FOIA/Privacy Act officer that I had not yet received determinations on my requests for records and expedited processing. A true and correct copy of that letter is attached as Exhibit C.  In that letter, I additionally related the details of my conversations with Ms. Byrd and Ms. Hundertmark. Finally, I asked that CBP "take every effort to ascertain the status of my request, and provide me with an initial determination and a response to my request for expedited processing by the end of the year."

10.  In an article published on December 15, 2005 CNET News.com reported on computer problems within the CPB, and made reference to the August 18, 2005 failure. The CNET article cited a different Department of Homeland Security spokesman who said that initial reports attributing the computer failure to a virus were in error, and that a virus was not responsible for the outage. The article quoted the official as saying, "they have computer glitches

DECLARATION OF KEVIN POULSEN IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. C-06-1743 SI

1   from time to time . . . and that was one instance of it." A true and correct copy of that article is

2   attached as Exhibit D.

3        11.   To my knowledge, CBP has made no statements explaining the discrepancy between

4   the cause of the outage reported in the August 19, 2005 AP story and this CNET report.

5        12.   On January 31, 2006, I received an undated letter from CBP's OIT, denying my

6   request for documents.  A true and correct copy of that letter is attached as Exhibit E.  The letter

7   was signed by Diane Hundertmark. The letter informed me that my request for "additional

8   documentation . . . has been reviewed and considered," but "[i]t has been determined that

9   additional information beyond what has already been provided to the media is exempt from

10  disclosure in its entirety pursuant to 5 USC 552 (b)(2), as it is solely related to the internal

11  administrative practices of this agency." The letter did not address my request for expedited

12  processing, but told me where to direct any appeal.

13       13.   On February 2, 3006, I appealed by sending a letter to CBP according to the

14  instructions detailed in the denial letter.  A true and correct copy of that letter is attached as

15  Exhibit F.  I appealed on the following five grounds: (1) CBP had wrongfully withheld records

16  because 5 U.S.C. §(b)(2) does not apply; (2) CBP had failed to provide information that was

17  already publicly known; (3) CBP did not conduct an adequate search for records; (4) CBP failed

18  to comply with time limits in processing my FOIA request; and (5) CBP did not respond to my

19  request for expedited processing. I briefly explained each of the five wrongful actions, and

20  requested that CBP respond to my appeal within 20 days as required by the FOIA.

21       14.   I have not received a response to my administrative appeal.

22       15.   On March 7, 2006, I filed through counsel a complaint against CBP in United States

23  District Court for the Northern District of California, seeking records concerning the August 18,

24  2005 incident.  Following the filing, I authorized my attorneys to negotiate with the attorneys for

25  CBP to obtain responsive records.

26       16.   On March 31, 2006, I received through my attorneys six pages of responsive records

27  via fax from the United States Attorney's office in San Francisco.  A true and correct copy of

28  that fax is attached as Exhibit G.  Included was a two-page document entitled "CBP Worm

DECLARATION OF KEVIN POULSEN IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. C-06-1743 SI

1    08/18/05: Executive Summary," and another document at least 2 pages long entitled "CBP
2    Worm (Zotob) on August 18, 2005: Executive Summary."  (Exhibit G.)  The pages were heavily
3    redacted, and one page was entirely blacked out.  (Exhibit G.)  The records relate that the Zotob
4    Internet worm infiltrated internal CBP computers on August 18, 2005, and CBP responded by
5    installing patches to those computers, and to the US-VISIT workstations responsible for border
6    intake screening.

7        17.  The pages I received were not accompanied by an explanatory cover letter from
8    CBP.  (Exhibit G.)  There was no indication that the six pages of records I received were the only
9    records located in CBP's search, and no exemption was given to justify the redacted portions of
10   those released records.

11       I declare under penalty of perjury under the laws of the state of California that the
12   foregoing, including all exhibits thereto, is true and correct, and that this declaration was
13   executed in Port Washington, New York on April 13, 2006.

14

15

16                                          /s/ Signature on Following Page
                                            KEVIN POULSEN
17   _____

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF KEVIN POULSEN IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. C-06-1743 SI
                                        -5-



1   08/18/05: Executive Summary," and another document at least 2 pages long entitled "CBP

2   Worm (Zotob) on August 18, 2005: Executive Summary." (Exhibit G.) The pages were heavily

3   redacted, and one page was entirely blacked out. (Exhibit G.) The records relate that the Zotob

4   Internet worm infiltrated internal CBP computers on August 18, 2005, and CBP responded by

5   installing patches to those computers, and to the US-VISIT workstations responsible for border

6   intake screening.

7       17. The pages I received were not accompanied by an explanatory cover letter from CBP

8   (Exhibit G.) There was no indication that the six pages of records I received were the only

9   records located in CBP's search, and no exemption was given to justify the redacted portions of

10  those released records.

11      I declare under penalty of perjury under the laws of the state of California that the

12  foregoing, including all exhibits thereto, is true and correct, and that this declaration was

13  executed in Port Washington, New York on April 13, 2006.

14

15                              KEVIN POULSEN

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

 **MSNBC.com**

# Customs computer virus strands travelers
**System back up after being shut down for several hours**

The Associated Press
Updated: 2:25 p.m. ET Aug. 19, 2005

MIAMI - Travelers arriving in the United States from abroad were stuck in long lines at airports nationwide when a virus shut down an U.S. Customs and Border Protection computer system for several hours, officials said.

Homeland Security spokesman Russ Knocke said the virus impacted computer systems at a number of airports Thursday night, including those in New York, San Francisco, Miami, Los Angeles, Houston, Dallas and Laredo, Texas.

Knocke said customs agents immediately switched to manual inspections. He declined to provide details on where the computer virus originated but said Friday the investigation remained open.

The worst delays appeared to be at Miami International Airport, where about 4,000 to 5,000 people waited to clear immigration, airport spokesman Greg Chin said. The passengers were not permitted to leave the area before then, but they all went through by midnight, he said. Everything was back to normal Friday.

Brian Hunt and his wife, who were visiting from Spain, said it took them nearly five hours to be processed.

"The agent was very charming, very nice and greeted us with a smile," he told The Miami Herald. "It was just an unfortunate thing, but these things happen. Who do we blame?"

The computer problem originated in database systems located in Virginia and lasted from around 6 p.m. until about 11:30 p.m., said Zachary Mann, spokesman for U.S. Customs and Border Protection in southern Florida.

At New York's airports, customs officials processed passengers by hand. Officials used backup computer systems to keep passengers moving at Los Angeles International Airport, where computers were down only briefly and delays from six flights lasted up to 2 1/2 hours.

"It was during a light time of travel for international passengers at LAX," said Mike Fleming, customs spokesman in Los Angeles. "All systems have been restored to full capacity."

*© 2006 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*

© 2006 MSNBC.com

URL: http://www.msnbc.msn.com/id/9002733/

# EXHIBIT B

Kevin Poulsen
Wired News
660 Third Street, 4th Floor
San Francisco, CA 94107.

August 22nd, 2005

**By Facsimile -- (202) 572-8727**

Bureau of Customs and Border Protection
Chief, Disclosure Law Branch (Mint Annex)
1300 Pennsylvania Avenue, NW
Washington, DC 20229

### RE: Freedom of Information Act Request
### and Request for Expedited Processing

Dear FOIA/Privacy Act Officer:

This letter constitutes an expedited request under the Freedom of Information Act
("FOIA"), 5 U.S.C. § 552, and  Bureau of Customs and Border Protection ("CBP")
regulations, 19 C.F.R. § 103.5, and is submitted by Kevin Poulsen, a journalist with
Wired News.

I am seeking any documents (including but not limited to electronic records) detailing,
describing or concerning the August 18th, 2005 failure of a  CBP computer system used
to process passengers arriving on international flights, which failure resulted in delays in
admitting international travelers in several U.S. airports, including those in Miami, New
York, and San Francisco.

**Request for Expedited Processing**
This request warrants expedited processing because it pertains to a matter about which
there is an "urgency to inform the public concerning actual or alleged Federal
Government activity," and the request is made by a person "primarily engaged in
disseminating information." 5 U.S.C. § 552.

On August 19th, the Associated Press and numerous other media outlets reported on a
prolonged failure a day earlier of a CBP computer responsible for processing passengers
arriving on international flights. Media reports, quoting CBP spokesmen, attributed the
failure to a computer virus.

The failed computer was reportedly responsible for security screening of international
travelers entering the U.S. If, in fact, it fell prey to a computer virus, this would suggest
strongly that a federal government computer system providing a vital security function

was not adequately protected from outside attacks, and could be subject to continuing and serious compromises.

The safety of U.S. borders is a matter of obvious and urgent interest to the public, and the care with which the CBP protects computers used for that purpose is a qualifying federal government activity.

**Request for "News Media" Fee Status**
I am a professional full-time journalist with Wired News, an advertising-supported online news site dealing with technology.

I agree to pay reasonable duplication fees for the processing of this request in an amount not to exceed $50. Please notify me prior to incurring any expenses in excess of that amount.

Thank you for your consideration of this request. As applicable CBP regulations provide, I will anticipate your determination of my request for expedited processing within ten (10) calendar days. Should you have any questions about this request, please feel free to contact me at (415) 276-8411.

Under penalty of perjury, I hereby affirm that the foregoing is true and correct to the best of my knowledge.

Sincerely,

Kevin Poulsen
Senior Editor
Phone: 415-276-8411
Fax: 650-745-1227

# EXHIBIT C

Kevin Poulsen
Wired News
500 Third Street, Suite 310
San Francisco, CA 94107.

December 9th, 2005

**By Post and Facsimile — (202) 572-8727**

Bureau of Customs and Border Protection
Chief, Disclosure Law Branch (Mint Annex)
1300 Pennsylvania Avenue, NW
Washington, DC 20229

### RE: Freedom of Information Act Request
### and Request for Expedited Processing

Dear FOIA/Privacy Act Officer:

I'm writing concerning my Freedom of Information Act ("FOIA") of August 22nd, 2005, a copy of which is attached.

To date I have not received an initial determination on my request, nor have I received an answer to my request for expedited processing. Those responses were due twenty (20) working days and ten (10) calendars days after receipt of my request, respectively. 5 U.S.C. § 552.

I spoke with your office today by telephone and was told that my request was forwarded to the Office of Information Technology for processing on September 8th, and that your office could provide me with no further details about the status of my request.

I then spoke with Diane Hundertmark at the Office of Information Technology. Ms. Hundertmark identified herself as the official responsible for handling FOIA requests within that office. She said she had no record of my request.

I know that your office received my request, because on September 23rd I was contacted by Erlinda Byrd from your agency's Office of Public Affairs. Ms. Byrd said that my request had been received, but that the official(s) processing it did not want to go to the trouble of conducting a records search that, in their view, would produce no information that they would be inclined to release, except for information that had already been released to the public and reported in the news. Ms. Byrd asked me to voluntarily withdraw my request, and I declined. She did not in any way indicate that her telephone call was intended as a denial of my request, therefore I expected that an official answer from your office would be forthcoming.

I'm confident that your agency would not simply discard a lawful FOIA request because of the inconvenience of fulfilling it. Please take every effort to ascertain the status of my request, and provide me with an initial determination and a response to my request for expedited processing by the end of the year.

Please also note my new mailing address, which is at the top of this letter.

Sincerely,

Kevin Poulsen
Senior Editor
Phone: 415-276-8411
Fax: 650-745-1227

# EXHIBIT D

 **NEWS.COM**    http://www.news.com/

## Aging computers hobble Homeland Security

By Declan McCullagh
http://news.com.com/Aging+computers+hobble+Homeland+Security/2100-7348_3-5995856.html

Story last modified Thu Dec 15 06:38:06 PST 2005

**Thousands of airline passengers unexpectedly found themselves stranded in line at U.S. border checkpoints in August, after a Department of Homeland Security computer crashed.**

At Miami International, some 4,500 frustrated travelers waited in cramped conditions. Airport staff handed out bottles of water and coloring books with crayons for children during the wait for the computer, which checks identities, to come back up.

"This incident was extraordinary," said Greg Chin, an airport spokesman. "In other cases when the computers have been down, it has only been for less than half an hour."

The crash shuttered the government's main immigration database in Virginia, affecting scores of border entry points. The shutdown highlights the computer problems that the Homeland Security Department is grappling with, as it struggles to reshuffle myriad functions once performed by the now-defunct Immigration and Naturalization Service.



It has been a daunting task. Aging, incompatible systems and outdated processes have contributed to a backlog of approximately 1 million people waiting for a decision from the department's Citizenship and Immigration Services bureau. Computer problems at its Immigration and Customs Enforcement bureau caused a snafu in which student visa holders were jailed overnight or barred from entering the United States.

Index cards of biographical data

The U.S. Citizenship and Immigration Services's systems have come in for particular criticism from outside analysts and government auditors, who say these are simply not up to the task of serving the public, especially when coupled with a continuing reliance on paper forms. In some cases, for instance, information typed into one computer must be manually retyped into a second or third.

"All filings are paper-based, which means that everything you submit has to be keyed into the computer, which of course opens up the additional possibility of error, slows the process down and prevents some processes from being automated," said Crystal Williams, deputy director for programs at the American Immigration Lawyers Association.

The USCIS bureau has spent $280 million over the last two years as part of its "backlog initiative" to reduce the number of outstanding cases, but most of that has gone to hire temporary employees. Less than two percent, or $4.5 million, was devoted to computer upgrades. (The Department of Homeland Security's overall budget is $30.8 billion for fiscal year 2006.)

One problem is that applications for different types of immigration status are saved in separate records. These aren't interlinked, which means an application for a H1-B visa is not tied to the same person's application for a green card--causing more paperwork and delays, until the two records can be matched by hand.

Other procedures are equally inefficient. "Heaven forbid if an attorney should change their address," Williams said. "They have to send a change of address for every separate case they've got pending. (Once) I had between 500 and 1,000 cases pending



at one time."

**Data stumbling blocks**
The holdups can be attributed in part to the Homeland Security Department's antiquated computer systems. The agency's mainframes do not share data and are accessible only by some offices. An upgrade to Microsoft's Windows 2000 operating system failed because of application incompatibilities, which meant one division had to undertake a cumbersome reversion back to Windows 95.

In the case of the immigration bureau, there has never been a centralized electronic method for managing the more than 7 million applications that stream each year into 250 USCIS offices scattered across the country and abroad.

Instead, the bureau's outposts rely on about a dozen different systems designed to enter, store and track more than 50 types of forms that cover everything from citizenship applications to student and worker visas and adoptions.



Not one of the systems can talk with another, according to government reports, and not all offices are equipped to log into the systems they need to update records.

Even the bureau's two primary case-management systems, called CLAIMS 3 and CLAIMS 4, are accessible only to certain staff at certain offices. These rely on proprietary software developed by a string of contractors in the early 1990s, "do not share data, and are extremely expensive to modify," the ombudsman concluded. (CLAIMS stands for Computer Linked Application Information Management System.)

CLAIMS 3, for instance, runs on both client-server and mainframe platforms, and USCIS service centers across the country independently use six different versions of the system. On a nightly basis, employees upload the information they've entered that day into a central CLAIMS 3 mainframe--which essentially means that changes to files aren't available until the next day.

All that suggests that a real dent in the USCIS backlog--which peaked at 3.8 million cases in January 2004 and has now settled at around 1 million--is unlikely to occur until the immigration bureau overhauls its geographically dispersed, often incompatible case-management processes.

"Despite repeated assessments and attempts to modernize, USCIS' processing of immigration benefits continues to be inefficient, hindering its ability to effectively carry out its mission," concluded a 56-page report (click for PDF) released this fall by the office of Homeland Security Inspector General Richard Skinner, who is responsible for investigating the department's 22 umbrella agencies.

A decade has elapsed since the last bureauwide upgrade of IT equipment. Some offices have adopted the practice of performing haphazard changes when budget money is left over, Skinner said, leading to a confusing patchwork of hardware and software across the bureau.

In his most recent annual report to Congress, Prakash Khatri, the immigration bureau's ombudsman, warned the Homeland Security Department's outdated technological infrastructure meant that "customer service is compromised." Khatri acts as a representative for people who have encountered problems.

The agency acknowledges that its computer systems remain a daunting obstacle. "The state of USCIS' current systems prevents it from implementing key initiatives, and has only allowed for incremental change," Tarrazzia Martin, the chief

information officer for U.S. Customs and Immigration (USCIS), wrote in an e-mail interview with CNET News.com.

**Inefficiencies yield delays, frustrations**
Oleg Baklenov knows firsthand how paperwork delays by the USCIS can roil a technology worker's family life.

Baklenov, a 34-year-old Russian electrical engineer who came to the U.S. 11 years ago to earn his doctoral degree, currently has a visa that permits him to work for a company in Greensboro, N.C.

Three years ago, he applied for what's commonly known as a green card, a form of immigration status that would permit him to become a permanent resident and seek citizenship. But a technical difficulty in submitting his name to the FBI for a mandatory criminal background check has delayed the process, he said.



People with worker visas have to file extra paperwork--which can take several months to process--to leave and re-enter the United States. Confident that his green-card application would be processed, Baklenov decided not to undertake the task of submitting those additional forms.

But now his ailing grandmother has been admitted to a Czech hospital, and the unexpected delay has effectively barred Baklenov from leaving the country to visit her. "The system will be more efficient if one computer system can communicate with different agencies and request all the checks that they need," said Baklenov, who is representing himself in a federal lawsuit filed in North Carolina, but is hoping for an out-of-court resolution.

National Records Center in Lee's Summit, Missouri

William Strassberger, a USCIS spokesperson, said he's not sure what caused Baklenov's problems and said the agency was still waiting for the security check. "If he wanted to make a request for advance parole for emergency medical reasons on behalf of his grandmother, it should be possible to do," Strassberger said. "Usually, we recommend submitting an application four weeks ahead of time, but if it's a situation where it requires urgent travel, it's possible to do that."

**Barriers to progress**
The situation is complicated by the ripple effects of the federal law creating the Department of Homeland Security, signed by President Bush in 2002, which carved the former Immigration and Naturalization Service into three slices.

Border patrol and customs agents formed the new U.S. Customs and Border Protection unit, while the bureaucracy for processing immigration-related requests was renamed U.S. Citizenship and Immigration Services. The similarly named U.S. Immigration and Customs Enforcement division now includes former INS "detention and removal" agents, federal air marshals and the Federal Protective Service.

Michael Garcia, an assistant secretary at the Department of Homeland Security, has likened the integration process to "trying to change the engine in an airplane in mid-flight." In testimony to the Senate in March, Garcia said: "We have had to build a new agency almost from the ground up--bringing together divisions from four separate agencies into a single functioning unit, and melding the cultures and missions of various units into a unified whole."

Large, distributed government systems are too often victims of poor planning, said Peter Neumann, a principal scientist in the computer science lab at SRI International, a not-for-profit research institute.

"What is needed is a set of requirements that really makes sense in the first place and an architecture that is capable of satisfying those requirements--a very serious software engineering discipline to ensure a system is not only going to meet those requirements but be evolvable over time," said Neumann, who has served on technical advisory committees for the IRS and the Government Accountability Office.

Referring to the August crash that left travelers waiting in line, Homeland Security Department spokesman Jarrod Agen said that some problems are inevitable. "They have computer glitches from time to time due to the complexity of the system, and they're not a frequent thing, but they do happen on occasion, and that was one instance of it." Agen said that contrary to some

initial reports, there was no evidence it was caused by a virus.

**Plans for change**
The USCIS didn't set up its own centralized information technology office until March 2004, a year after Homeland Security was formed. It now says it has a multiyear "IT Transformation Strategy"--but officials have refused to disclose the cost or the anticipated timetable.

Nor is a single document publicly available. Instead, the plans are scattered around in multiple documents, such as a "mission needs" statement, presentations, white papers, and so on, spokesperson Strassberger said. The bureau is currently in the process of awarding contracts and cannot discuss the details, he said.

Some attempts at modernization have been made. It's now possible, for instance, for immigration applicants to file nine types of forms electronically and to check their status online. But because the e-filing system can't talk to any of the existing case management systems that employees use, those employees must manually retype those forms into the appropriate database.

In November, the department completed a "refresh" of workstations in its California service center, installing more than 1,200 new workstations, printers and monitors, and "modernizing and standardizing" its network, according to a December bureau newsletter. Similar updates are scheduled for several more offices in 2006.


Boxes of files ready for shipment to National Records Center

Robert Divine, the bureau's acting deputy director, said the organization is committed to making the fixes, but it can't do so without a big budget increase.

Because most of the bureau's revenue comes from application fees, not from the federal government's pockets, "the type of significant, up-front funding that will be required for fully modernizing information technology is not clearly within USCIS' means," Divine said in a September letter to the Department of Homeland Security's assistant inspector general for information technology.

**On ICE**
Problems have also plagued computers used by the U.S. Immigration and Customs Enforcement bureau. Since 2003, schools and student-exchange programs have been required to use a Internet-based tool known as the Foreign Student and Exchange Visitor Information System (SEVIS) to store and track personal information about foreign students before, during and after their stay in the United States.

University administrators testifying before a congressional committee have complained that SEVIS frequently lost data, could not handle large batches of information submitted at once, did not provide real-time access to records. The system would sometimes result in documents--many of a confidential nature--inexplicably being printed out on computers at completely different schools.

In its most recent evaluation of SEVIS, published in March, the Government Accountability Office acknowledged that the system is now receiving fewer gripes from educational organizations. GAO said that's partly due to better help desk staffing and training, and new software releases. However, ICE has not resolved all of the system's glitches, it said.

Meanwhile, immigrants like Baklenov continue to wait for results. "We're trying to do as much as we could thru the phone and through talking to our friends in the Czech Republic and asking them to help," he said, referring to his grandmother. "She's still in the hospital and we're trying to do the best for her--from overseas, unfortunately."

Copyright ©1995-2006 CNET Networks, Inc. All rights reserved.

# EXHIBIT E

U.S. Department of Homeland Security
Washington, DC 20229



**U.S. Customs and
Border Protection**

Mr. Kevin Poulsen
Wired News
500 Third Street, Sutie 310
San Francisco, CA 94107

Dear Mr. Poulsen:

This is in response to your Freedom of Information Act (FOIA) request that we received in our office on December 30, 2005. Please allow me to apologize for the confusion in regards to your original request of August 22, 2005.

Your request for additional documentation related to the U.S. Customs and Border Protection computer system outage of August 18, 2005 as reported by the Associated Press and other media outlets such as the Miami Herald has been reviewed and considered. It has been determined that additional information pursuant to the incident beyond what has already been provided to the media is exempt from disclosure in its entirety pursuant to 5 USC 552 (b)(2), as it is related solely to the internal administrative practices of this agency.

If you consider this to be a denial of your request, you may file an appeal to the Assistant Commissioner, Office of Regulations and Rulings, U.S. Customs and Border Protection, 1300 Pennsylvania Avenue, NW, Washington, DC 20229. Your appeal must be made in writing within 35 days after the date of this notification.

Thank you for your interest in U.S. Customs and Border Protection. If you have any questions or concerns, please contact Ms. Diane Hundertmark at (202) 344-2719.

Sincerely,

Cristin C. Fair
Office of Information and Technology
Chief of Staff

# EXHIBIT F

Kevin Poulsen
Wired News
500 Third Street, Suite 310
San Francisco, CA 94107

February 2nd, 2006

Assistant Commissioner
Office of Regulations and Rulings
U.S. Customs and Border Protection
1300 Pennsylvania Avenue, NW
Washington, DC 20229

**RE: Freedom of Information Act Appeal**

Dear Assistant Commissioner:

This is an appeal under the Freedom of Information Act ("FOIA"). 5 U.S.C. §522(a)(6).

On August 22nd, 2005, I made my initial request for documents under the FOIA from the Bureau of Customs and Border Protection ("CBP"). I requested documents relating to the August 18th, 2005 failure of a CBP computer system used to process airline passengers arriving on international flights. In that letter, I also requested expedited processing pursuant to the statute.

On January 31st, 2006, I received a notice of determination on my initial request from the CBP's Office of Information and Technology in an undated letter signed by Ms. Diane Hundertmark. The determination was a denial of my request for documents. A copy of the response is enclosed. Without the intent of limiting any future action, I appeal on the following grounds:

(1) The claimed exemption is inapplicable to the documents requested. In its denial, the CBP claimed an exemption from the FOIA's requirement of disclosure under 5 U.S.C. §522(b)(2), which exempts documentation that is "related solely to the internal personnel rules and practices of an agency." The Supreme Court has determined that this section is meant to exempt from disclosure documents relating to "matters of daily routine" that could not reasonably be of interest to the public. *Department of the Air Force v. Rose*, 425 U.S. 352 (1976). Far from this model, I have requested documents relating to a significant incident that is of great interest to the public. The failure of a government computer system that regulates U.S. borders can hardly be called a trivial matter.

(2) The CBP failed to provide me with documents containing information that has been made public. In the response, Ms. Hundertmark acknowledged that information "has already been provided to the media." The CBP should not have

withheld documents that substantiate their statements to the press. There is a need for documentation corroborating the information publicly released, and this need is intensified by the media's inconsistent reporting on the August 18th incident. Please see the enclosed news articles which attribute the computer failure to different sources.

(3) The CBP did not conduct an adequate search for records. The FOIA requires that an agency "make reasonable efforts to search for records." 5 U.S.C. §522(a)(3)(C). The response indicates that my request was "reviewed and considered" but does not indicate that a search was conducted. In addition, Ms. Hundertmark claims that my request was for "additional" documentation, suggesting that at least some documentation was available. Given the language of the response and the fact that no documents were provided or listed as withheld, I can only conclude that a reasonable search was not conducted. This is a violation of the FOIA.

(4) The CBP failed to make an initial determination on my FOIA request within the statutory time limit. An agency must make a determination on any FOIA request within 20 days of receiving such request, and must provide immediate notice to the requester. 5 U.S.C. §522(a)(6)(A)(i). I received notice of the determination on my request 5 months after I submitted it. This undue delay in processing is clearly in violation of the FOIA.

(5) The CBP failed to make a determination on my request for expedited processing. The FOIA requires that within 10 days of the date of the request, an agency make a determination on whether to provide expedited processing and provide notice of that determination to the requester. 5 U.S.C. §522(a)(6)(E)(ii)(II). As my request was dated August 22nd, 2005 and I have not received an answer to date, this FOIA requirement was not met.

Thank you for your consideration of this appeal. I will expect a reply within 20 days pursuant to 5 U.S.C. §522(a)(6)(A)(ii). Should you have any questions about this appeal, please feel free to contact me at (415) 276-8411.

Sincerely,

Kevin Poulsen
Senior Editor
Phone: 415-276-8411
Fax: 650-745-1227

# EXHIBIT G





U.S. Department of Justice
United States Attorney
Northern District of California
450 Golden Gate Avenue, Box 36055
San Francisco, CA 94102
Telephone Number: 415/436-7200
Fax Number: 415/436-7234

# FAX

| To | Linda Johnson<br>650.723.4426 |
|---|---|

| From | Bonny Wong, Legal Assistant<br>to<br>Andrew Y.S. Cheng, AUSA | | |
|---|---|---|---|
| **Phone** | (415) 436-6904 | **Fax** | (415) 436-6748 |

Date:  March 31, 2006              Pages: [ 8] including cover

Re:   Kevin Poulsen v. United States Customs and Border Protection
      C06-1743 SI

ATTACHMENT:
•     Documents from Customs and Border Protection

COMMENT:

## CONFIDENTIAL U.S. ATTORNEY FACSIMILE COMMUNICATION

The information contained in this facsimile message, and any and all accompanying documents constitutes
confidential information. This information is the property of the U.S. Attorney's Office. If you are not the
intended recipient of this information, any disclosure, copying, distribution, or the taking of any action in reliance
on this information is strictly prohibited. If you received this message in error, please notify us immediately at the
above number to make arrangements for its return to us.

**CBP Worm 08/18/05**
**Executive Summary**

**08/17/05**

On 17 August 2005 the CBP ███████████ init ated a ███████ distribution to the CBP ████████████ worl stations (normal desktop workstations) as a result of the ███████ expo ure to this worm. USVISIT workstations were not targeted for distr bution as part of this initial distribution. Due to the nature of the Micro soft patch, further testing was conducted to ensure that none of the USVISI ███████████ ███████ would be impacted as a result of th s patch ████

**08/18/05 1730**

At 1730 18 August 2005 the CBP ███████████ w s informed that the previously defined worm was present in the CBP nvironment. Initial reports confirmed that the USVISIT workstations were ████████ impacted ███████. Aft r the notification of the worm being present in the CBP environment, the USVISIT Program Manager ████████████ gave permission to d stribute the patch ████ ████ to the USVISIT workstations.

**08/18/05 1955**

█████ patch distribution initiated at 1955 to the ██ identified ████ workstations.

**08/18/05 2130**

At approximately 2130, the ██████████████ ███████ reconfigure the ██████████ to lower the network utilization.

**08/18/05 2030**

█████ of the USVISIT workstations were pat hed ████████ by 2030.

**08/18/05 2230**

The majority of the USVISIT workstations were atched by 2230.

**08/18/05 2355**

At 2355 the distribution had reached ██ of the USVISIT identified workstations. CBP CSIRC monitored and identifi d machines that were showing the presence of the infection. ████████████ ███████████████████ The combinati n █████████ ███████████████ has allowed



all sites to regain functionality. ███████████ ████████ ████████

**08/19/05 0030**
███████████████████████████ ████████ ████████
████████████

**08/19/05 0100**
As of 1:00am, on August 19, ████ of the ████ machines had been taken care of.

**08/19/05 0200**
Based ████████ reporting at 2am, August 19, there were ████ machines that had not received the anti-virus patch ████████ ████████ ████ ████████████████ were dispatched to focus on these machines.

**08/19/05 0500**
As of 5am, ████ (or ████ workstations) of the ████ workstations ████ ████████████████ were manually updated.

**08/18/05 0900**
Currently, triage has been established within the CSIRC and the help desk ████ to allow individual workstation remediation throughout the enterprise.



# CBP Worm (Zotob) on August 13, 2005
## Executive Summary

On 17 August 2005 the CBP Operations staff initiated a ███ ███████ distribution to the CBP ████████████ workstations ██████ ████████ as a result of the ████████ exposure to this worm variant. ████████████████ Due to the nature of the Microsoft patch, further testing was conducted to ensure that none of the USVISIT peripherals ████████████ would be impacted as a result of this patch. ████████████████

At 1730 18 August 2005 the CBP Duty Officer was informed that the previously identified worm variant was present in the CBP environment. Initial reports confirmed that the USVISIT workstations were ████████ impacted ████████ ████████████████ After the notification of the worm variant being present in the CBP environment, the USVISIT Program Manager ████████████ gave permission to distribute the patch ████████████ US-VISIT workstations. ████████████████████

The majority of the USVISIT workstations were patched by 2230 on August 18th.

Based on ████ reporting at 0200, August 19, there were █ █ machines that had not received the anti-virus patch update ████████████ █████.



CBP deployed the ████████ patch to its ████████ workstations beginning late on Tuesday, August 16. With the exception of the ████████ US-VISIT workstations, about ████ of CBP's workstations had received this patch by the end of Wednesday, August 17, ████████████ ████████████████████ The ████ not receiving the patch via the

automated process are being addressed via manual installation of the
patches 

2. The push was not made to the US-VISIT workstations during the initial
install due to concerns with the possible impact of the patch on the unique
US-VISIT workstation configurations.

Additional testing was being conducted with the patch to ensure the
workstations would not be impacted.

          When the virus problems appeared on these workstations
Thursday evening, the decision was made to push the patch, immediately, to
the ▆▆▆ US-VISIT workstations. Most workstations had received the patch
by midnight and US-VISIT was back in operation at all locations. As of
about 0800 Friday, over ▆▆▆ of the workstations had received the patch.
The remaining workstations are being addressed with manual installation of
the patch.

CBP expects all US-VISIT workstations to have the patch by noon today
(08/19/2005). All other workstations should be completed by the end of the day
(08/19/2005).

### Recommendations:
Deployments, upgrades, and changes must follow defined procedures and
established configuration management.

Initiate timely distribution of software and application elements for testing and
pre-staging events. Adequate tests and "due diligence" must be performed as a
safety measure and accurate evaluation of success must be made to establish
confidence in the support of critical processes and provide for prompt technical
participation.



Detail of Microsoft Vulnerability Notification:

Microsoft Security Bulletin ████████
**Vulnerability in Plug and Play Could Allow Remote Co  le Execution and
Elevation of Privilege (899588)**
**Issued:** August 9, 2005
**Version:** 1.0

Affecting Microsoft Windows 2000       Impact **critical**

This update resolves a newly discovered, privately reporte I vulnerability. Remote
code execution vulnerability exists in Plug and Play (PnP)  hat could allow an
attacker who successfully exploited this vulnerability to tak ∍ complete control of
the affected system. An attacker could then install prograrr s; view, change, or
delete data; or create new accounts with full user rights. Tl e vulnerability is
documented in the "Vulnerability Details" section of this bu etin.
We recommend that customers apply the update immedial ∍ly.